Good morning, Your Honors. Meera Hashmal, Counsel for Appellant. I'd like to reserve five minutes for rebuttal. There are really two separate aspects of this case. The District Judge granted summary judgment on the First Amendment retaliation claim, and then there are a number of claims that arise directly from the May 15, 2012 incident involving Mr. Mulligan and the LAPD. I'm going to start first with the retaliation. It was an error to take this case away from the jury. The conduct in this case is truly shocking. The highest levels of our city government, the LAPD going all the way up to Chief Beck, the City Attorney's Office, and the head of the Police Litigation Union. And what evidence is there that Chief Beck was involved in the decision? Extensive evidence. First, Commander Andrew Smith said that the Glendale tape could never have been released without Chief Beck's authorization. Second, the correspondence of the police union's president is, we need Chief Beck's help to get the tape, because as you know, Your Honor, Glendale wouldn't give the tape to the police union. They had to use the auspices of the force investigation to get it as if it were needed. But in fact, the testimony from Captain Lopez and Sergeant Ryuta is that the Glendale tape was not part of the force investigation unit's work at all. They didn't know it existed. They didn't need it. It was all essentially a ruse to get the tape and get it through the LAPD to the police union. Similarly, there is an October 3rd meeting, which is critical. It's involving Chief Beck, his chief deputy, Rick Jacobs, a gentleman named Gerald Chalif, who is the head of constitutional policing and essentially Chief Beck's legal advisor, and Captain Lopez, the head of FID, as well as Commander Smith, the head of media relations. And there they're discussing the Glendale tape and whether or not they want to release it or not. So let's assume that, you know, the tape, you know, sort of should not have been released, but it was, regardless of whether it was because of this person doing it or that person doing it. What difference does it make in terms of the constitutional standards that ought to be applied or must be applied to ascertain whether this is, you know, a retaliation claim in the context of the Constitution? I mean, does it make a real difference who released the tape? The sequence of events is very important because it shows joint action. The police union would stand— Assume that's the case. Assuming there's joint action. The tape was released. Well, it's important for many reasons. First of all, it shows that the LAPD violated its own rules, acted in concert. They violated its own rules. Go ahead. This is a constitutional issue. Yes. And the retaliation here is all three elements are met because this is conduct that would chill a reasonable person's free speech, and it shows retaliatory intent. What is the right standard? I mean, it seems to me that when you're dealing with this type of particular situation where you have speech against speech, that the standard is whether or not there was a threat, coercion, or intimidation, not whether there was, you know, activity that would constitute a deterrence from future speech. I'm a little bit, you know, unclear about what the right standard is to employ here. I think it's a mistake to adopt the threat, intimidation, and coercion language from the Fourth Circuit's swore as matter. First of all, that case is factually distinguishable, but more than that, the court here on Cositler has said the Ninth Circuit is not going to parse out the type of conduct. That was an employment termination case. So outside of that, we have cases, you know, Ginnie and Nunes, which basically says speech, even if defamatory, can never be retaliation. There has to be an action against a tangible interest and reputation isn't enough. What do we do with particularly Ginnie and the standard that sets for retaliation? Well, those cases have been really focused on the lack of a cognizable injury. In particular in Nunes, the issue there was that the plaintiff couldn't show a tangible harm. It says scolding, threatened to transfer or dismiss is not enough, and Ginnie says defamation and damage to reputation is not enough. Right, and here we have the undisputed fact that as a result of the October 15 press release, Mr. Mulligan was terminated by his employer. But not by the state employer. So that's not the employment termination context that Cositler and other cases are looking at. I would agree, and there are a very limited amount of cases that deal with this type of retaliation claim. The great body of cases comes under the public employee standard. And Ginnie, she ended up getting either terminated or rebuked by her employment as well, I thought. Yes, but they couldn't tie it to the retaliation conduct here. This case is a lot like Mendocino. That didn't matter. We said that was not enough. A speech of that sort doesn't constitute retaliation outside of a tangible interest in a state employment termination context. Yes, but this case is a lot like Mendocino, where the Ninth Circuit said that the law enforcement there, in retaliation for environmental activists criticizing their enforcement action, held a press conference, accused the activists of criminal conduct. And that was actionable retaliation. The same type of issues here. And it's not pure speech. I mean, they did this whole orchestrated series of events to get this tape and release it in the most damaging light as possible. They released the tape. This is really what happened. They released this tape, correct? Well, this is to make the mechanism how they released the tape, who authorized the release of the tape. The tape was in existence, correct? Is it your position that it should never have been released at all? The conduct in the release was a violation of their own rules, and the Ninth Circuit has felt that is an inference of retaliatory intent in and of itself. You're saying that the tape should not have been released by anybody, that there be a releasing of the tape is sufficient to, you know, allow this case to go forward? There might be a hypothetical set of circumstances where the release could have been valid, but here that's not what happened. Explain what you mean by that. I mean, there was this tape. There was a lot of activity on the part of your client. The authorities decided to release the tape. Just be clear with me. Are you telling me that the tape should not have been released at all under any circumstances? No, but what happened here was retaliatory. Well, when could the tape be released then? In response to potentially a legitimate discovery or subpoena, but that didn't happen. And what did happen is— It requires a subpoena or something like that to justify the release of the tape. Otherwise, it stays secret. It was confidential by their own rules. I mean, the secret— It's their rules, but we're talking about the Constitution. I just wonder what you're telling me, that if there's a violation of the local rule of the police department, that that is sufficient to allow the case to go to the jury on a constitutional issue of retaliation. No. What I'm telling you is that the evidence here on summary judgment met all the prongs. We had protected conduct, conduct which would show a reasonable person's speech and retaliatory intent. And the timing is important. This all started on October 12th. Why is your client the only one that's allowed to speak to the press? He's not, but he's not— Why isn't the other side allowed to offer up what they have to say? Well, first of all, the Bill of Rights and the law is clear on this. It protects individuals from government oppression. The government doesn't have a free speech right here. So it's a muzzle on the government. The government officials are not allowed to speak back. In this case, the police officers aren't entitled to speak back? They're not entitled to retaliate for someone's exercise of their rights. Are they retaliating on the exercise of rights or retaliating and responding to what he said? The evidence shows a sequence of events which belies this idea that this was purely self-defense. On August 12th, they leaked the confidential arrest report to TMZ. TMZ cited the LAPD as its sources, cited confidential information. Again, that was a confidential arrest report. It should never have gone to TMZ. That's August 12th. August 14th, Mr. Mulligan files an administrative claim. And the reason this is important is because that's a precursor to civil litigation, but it's not the civil complaint. What's your theory about why TMZ shouldn't have published a story about this incident? The LAPD leaked a confidential arrest report. They gave information to the press. In violation of their own rules. So it's back to their rules, is that what you mean? It just shows that this idea that Mr. Mulligan invited these vicious attacks on his integrity in the public realm is false. They leaked this report. Mr. Mulligan exercised his constitutional right to pursue a civil claim, and they continued to leak their own records. But then after August, there was no press. Mr. Mulligan hadn't made any statements. It's critical because they knew that. The documents show that early in October, Chief Beck wanted to see what Skip Miller, Mr. Mulligan's new attorney, would do. And October 11th, the correspondence shows that the police union knew Skip Miller was not going to litigate this in the press, wasn't going to make any more statements. And yet, on October 15th, they issued this scathing press release. They call him a deranged drug addict. They name his current employer, his former employers. They say he's essentially a stick-up man who's trying to extort the LAPD. They accuse him of criminal activity. I mean, this goes – this is – You would have a state defamation claim. I can see that. I guess my question is, what makes it a constitutional claim? Because it is predicated on a retaliatory intent. Their own email said that they wanted him to fold his case. But the conduct has to be of the sort – the conduct that they took has to be of the sort that we say can be prosecuted as First Amendment retaliation. Yes. And so all they gave was speech, their own version of events, their leaked material, whatever it is, their reports to the press. And I don't see anything in our cases that say that that is conduct that can be prosecuted under the Constitution as First Amendment retaliation. I think Mendocino is right on point, Your Honor. That is a press conference by law enforcement accusing these activists of criminal conduct. I mean, here I think we have a broader course of wrongful behavior. Mendocino was just a press conference. And the court here said that summary judgment is improper. That's a viable First Amendment claim. And the deterrence test has proven very adaptable to circumstances. I think it's a mistake to try and parse out and create different retaliation tests based on the type of conduct at issue. The press release of the case that you cite was not a case in which there was an underlying speech by the defendant that was then, you know, countermanded like you have in this case by speech on top of speech. And this is a situation where speech begets other speech that's different than the press release case that you cite. Well, the environmentalists were in a car and their own explosive device exploded. Right. But they had a history of criticizing law enforcement. I mean, that was their mission essentially as environmental activists. So there was speech in that case. But here, the release of this press release coupled with this scathing malicious, the tape and the press release together, wasn't in response to anything, one. And, two, here the district judge said, well, maybe this is run-of-the-mill litigation tactics or maybe it was to defend the honor of the LAPD. But those are all jury questions when it comes to the issue of retaliatory intent. Does intent really enter into the equation here? As Judge Acuda said, you have to look at the conduct, whether that itself, you know, qualifies. I don't know whether intent really makes a difference here. I assume they intended to do bad things to him. But does it really make a difference? It does because the question is, would a reasonable person be chilled if the LAPD's highest brass decided to Is that the standard, by the way? It is. It is. Is that the standard in this type of situation when you're dealing with an underlying exercise of somebody's right to make a speech and you're dealing with alleged retaliatory speech? Well, here's the thing is that the First Amendment requires protected conduct. So my client filed a claim and said he wanted to pursue his rights. I mean, if we start crafting a special standard because speech came first, you're actually going to be excising an entire body of First Amendment activity that fits that first prong. I mean, most of that protected conduct is going to be speech-related. And so this idea that speech and then speech changes the inquiry, I think, is doing violence to the principles that are in it. Do you want to factor it all? You don't think that's relevant at all, what the underlying speech is that we're dealing with here? I don't because I think the question is, did you exercise your First Amendment rights? You're going to often be doing that by using speech. And the question is, did you then get subject to conduct that would chill your reasonable person's speech? And was it based on retaliatory intent? Now, the police union makes a bunch of arguments about the First Amendment protects their conduct, but there's extensive evidence of joint action. Those arguments don't work here. They say, well, we had other motivations. Again, intent, that's a factual issue. The city says, well, now liability doesn't work. That was an issue the district judge didn't reach, and for good reason. It's admitted that Chief Beck is a policymaker of the city. His fingerprints are all over this from inception to release. He's in these key meetings. They're discussing. Chief Beck knows the union has a tape. Commander Smith said it wouldn't have been released without Chief Beck. So there was clear basis for policymaking status as to Monell. And also Corey Brent runs the city's police litigation. And he is the one who leaked the tape after hours on his personal e-mail. Now, that was all to try to hide the LAPD's violation of its own rules. So there's a series of conduct here that the jury should have had an opportunity to look at. Can you also address the negligence issue? So in the brief on appeal, the argument seems to be focused more on pre-force conduct. The negligence case should not have been decided on summary judgment. But now that we are on appeal and we've got the excessive verdict judgment here, excessive force judgment, the question is, well,  The concern was this pre-force use of force based on, I guess, Hayes and the deadly force case wasn't raised to the district court. So the argument is that it was waived because this is a different looking at the negligence leading up to the use of force was not raised to the district court. I don't think that that's an accurate characterization of the record. I think the negligence claim that went to the summary judgment was the full series of events leading from the sequestering and handcuffs despite being deemed to be calm, lucid, cooperative, not engaged in criminal activity, taken to the seedy motel full of criminals and parolees, told to stay under threat of death essentially and causing him to flee in fear and the ultimate injuries. All of that was part of the negligence case. The district judge sort of made a perplexing ruling that there were trial issues of fact on excessive force but not on negligence. The appeal has been focused on the fact that regardless of whether or not the jury verdict stands, they didn't decide the broader course of police negligence and Hayes shows the inquiry is broader, that the Fourth Amendment inquiry isn't determinative if the police set off a set of events that caused harm and therefore the police negligence claim is viable and really should have gone to the jury but certainly can go to the jury notwithstanding the excessive force verdict. I don't think it's an issue of waiver. I don't think defendants have ever argued waiver as to the police negligence claim at all and that was fully preserved on the summary judgment briefing under the broader theory and then also under a more narrow theory if the verdict stands. Similarly, the negligent retention claim was deemed viable for the purposes of summary judgment but then was subject to a bifurcation ruling and never got to a jury. That claim should as well. As far as the excessive force judgment itself, the trial was an unfair playing field. You know, the officers went to this jury and they said Mr. Mulligan was engaged in carjacking and robbery and all of these lurid details of alleged crimes. They were citing the penal code to this jury and the fact is that Mr. Mulligan was never prosecuted for any crime at all, not a felony by the DA and not a misdemeanor by the city attorney who rejected the case twice and this actually goes to the essential issue of credibility. The jury had to decide whose account to believe, Mr. Mulligan or these two LAPD officers who were dressed up as heroes and who were presented to the jury as having this impeccable credibility. The fact that they described these crimes that Mr. Mulligan was never charged or pursued on went to the essential credibility of their depiction. You tried on the cross-examination, simply ask the officers, was he ever charged with these crimes? We tried, but that was precluded on a pre-trial motion in limine. And then even when they opened the door again... So I understand, you're telling me that there was a pre-trial motion in limine that said that this would be an impromptu inquiry of cross-examination. Once they testified, they could not be asked whether in fact he ever was convicted of a crime. Yes, and in fact during the trial when it came up and counsel said, hey, they're opening the door here, the court said, no, it's not relevant. But it was relevant. It was relevant to the credibility of their depiction of the events. Did the police officers actually say he was arrested for these particular crimes? They didn't say he was arrested, but they said he committed the crimes. They described him as if he was engaged in all of this... They never said that he was arrested. No, they didn't make that specific statement, but they paint this picture for the jury and the jury doesn't hear the truth. Similarly, they hold Officer Nichols up like he's the officer of the year and he's a known rapist. He's subject to multiple on-duty rape allegations. Years before the Mulligan incident, the LAPD knew about that. This is under 403 material. That's clearly discretionary on the part of the district court. The district judge didn't... It's a collateral issue that was brought out. You'd have a trial on top of a trial. Those that seem to me, I guess I'm speaking as a district court judge now, clearly within the purview of the exercise of the district court's discretion under 403. Well, the court didn't actually do a 403 balancing test. He just blocked the evidence. And the reason it was important is because Mr. Nichols went to the jury and said... He was asked about all the time he had with Officer Miller to discuss what they were going to say happened that night. They had hours before they ever were even interviewed about the use of force. The suggestion was, well, didn't you have time to collude? He said, oh, I'm not a dirty cop. I wouldn't do that. I mean, that's the kind of representation he could have never made to this jury if they knew he was accused of multiple on-duty rapes. Similarly, his counsel said, do you want him at your door at 3 in the morning? The city's attorney said, this is about credibility. Who are you going to believe? Why would Mr. Nichols ever engage in this sadistic conduct? Well, his pattern is sadistic conduct. The dominance and the power and the control we see in his on-duty rapes is very similar to the course of conduct that occurred here, taking Mr. Mulligan to the seedy motel, threatening his life. The torturous actions in connection with breaking his scapula twice and shattering. He wasn't convicted of any of these activities, if I recall. You know, you're talking about charges that would be in May, but there was no conviction of any underlying improper conduct on the part of the officer, was there? The DA's just filed a felony complaint against Officer Nichols and his partner. But at the time of the trial, there was an extensive detailed record from the internal affairs investigation. Going through all of that, I mean, during the course of the trial? I mean, if there was an actual conviction, I can understand maybe you may have some cogency to your argument, but what is the district court judge supposed to do? Open up the entire trial to the essence of that complaint and the disciplinary proceedings that are pending? Your Honor, I see my time is elapsing, so I want to answer your question. The inquiry here, as it relates to the excessive force under 404B, does not require conviction. It just shows that it needs a compelling connection between the alleged acts and the events at issue here. It went straight to his motive and his intent. There are many examples of an officer's disciplinary record being highly relevant and admissible in cases of excessive force because it explains that this is how this officer operates. But there was no adjudication, disciplinary adjudication here. Maybe I'm reading it wrongly, but I don't see it. That's true at the time, but now they've fired him and he's under criminal prosecution. But even then, there was extensive evidence, there was civil litigation pending, and their own investigative files showed multiple women with independent accounts of the same type of conduct Mr. Mulligan was subjected to, and that met the standard for admissibility. Finally, as to the Mulligan II matter, Eric Rose obtained dismissal on 12B6 on collateral estoppel grounds arising from the First Amendment ruling on summary judgment because that should be reversed, so too should be the dismissal. Thank you. We'll hear from the defendants. It turns out we have a situation that I had forgotten about. We have multiple parties on behalf of defendants. So before we start the clock, let me ask if there's any understanding as to how the—is there going to be a divided argument? And if so, how is the division? Yes, there is, Your Honor. Jules Zeman representing Officer Nichols. I'll be taking the first five minutes. Then Blythe Bach is representing the City of Los Angeles, and she'll be taking between seven and ten minutes. And then Mr. Alexander Cote is representing the union, and he'll take the remainder of the time. Bach will show 20. Keep it in mind. Thanks, Your Honor. Hard to know where to start here, but on behalf of Officer Nichols, I'll be addressing the police negligence claim and also the excessive force and the alleged evidentiary errors made by the court, or the asserted errors. Going first just to the background of the litigation, it seems as if the characterization of counsel is that Officer Nichols was operating alone on this evening where excessive force was alleged. There were three other officers involved at that point in time. Two other officers and Officer Nichols had to actually use the full force of their weight to sit on him in order to restrain him. So it's not a situation, first of all, where factually Officer Nichols had an opportunity or any other kind of situation which presented itself to interact with Mr. Mullins directly on a one-on-one basis. But 404 itself of the federal rules of evidence should preclude any evidence of bad character or alleged bad character when it comes to trying to persuade the jury that the actor had conformed to that bad character in later subsequent actions. He has never been convicted. These still are allegations. There was no adjudication of any kind. And, in fact, it's a very dissimilar set of circumstances here. You have an excessive force case versus some charging allegations of sexual crimes while working in a narcotics unit in Hollywood. So we would respectfully submit that there's no basis in the law for there to have been an evidentiary ruling that that evidence should have come in. It would have been very confusing to the jury. It would have taken undue amounts of time. There would have been three or four other cases that would have had to have been tried within the context of the excessive force case. And there was no... Literally, there's no element in excessive force of motive or intent, and that apparently is what Plano's counsel is arguing in her papers, that could have been the motive for allowing that kind of evidence. I think it was perfectly correct and within the discretion of the district court to preclude that evidence. On the police negligence cause of action, we have a situation here that is very unlike the Hayes case where in that case it was a pre-deadly shooting case and the actions, the alleged negligent actions of the officers were directly connected in the same use of force in a very continuous flow. Whereas here you have the allegations that negligence took place at placing Mr. Mulligan in a motel for his safety to get him off the streets after they had received multiple 911 calls about him trying to break into automobiles and other witnesses including an officer at the city college and some of the 911 calls had indicated that he was incoherent and talking into the air and yelling and screaming. The officers put him into their vehicle. They found his automobile. They helped him find his identification. They found $3,000 worth of crumpled up bills in his car. They called one of their supervisors to make sure it was properly counted and then accounted for and they drove him to a motel because he would not tell them where he lived and they wouldn't give any names of who they should call to retrieve him. An hour later is when they discovered him again, this time attempting a carjacking and also attempting to break into parked cars. They insisted that he halt and he fled and then he attacked them when he was cornered. Under California law, including the California Supreme Court case of Sewell v. General Motors, there are doctrines that are very well accepted for interceding, superseding, causation. There's two situations that are mentioned by the Supreme Court and have been part of California law forever and those are the situation where the event would have happened notwithstanding the allegations of negligence on the part of the actor's accuser. But we have to take the facts in the light most favorable to the non-moving party, not your theory of what the events were that took place. And so the question is, as I understand it, given the jury's verdict that there was an excessive force, can they nevertheless proceed based on their theory of the case with a negligence claim relaying only to the pre-use of force negligence? Why can't they proceed on that given that we're taking their facts as being the facts? I think in some circumstances, and for example the Hayes case, I think the California Supreme Court decided in certain circumstances they could proceed on a police negligence claim for relief on pre-force activity and pre-force allegations of negligence. However, the Ninth Circuit itself has indicated that causation can be determined as a matter of law and that it's the court itself that determines when it can be determined as a matter of law. And I think here we have a total disconnect between the admittedly peaceful drop-off at a motel and a second scenario where force was required with intervening, superseding actions by the plaintiff himself and by the scenario that the police discovered that somebody was attempting to carjack and pull a woman out of her car. This simply is not enough here to allow the issue of causation to go to a jury is what you're arguing? That's exactly what I'm saying, Your Honor. And unless there's any further questions, I'll pass the baton to my colleague. You may. Thank you, Your Honor. Good morning, Your Honors. Blythe Bock on behalf of the city of Los Angeles. And I would like to, I don't want to repeat my brief, so what I thought I'd do is just address some of the points that were made by plaintiff's counsel up here and sort of revert you back to the issues. The first thing that really struck me is that plaintiff's counsel argued that this alleged retaliation was done by the words used were the highest levels of government and that the LAPD leaked this police report. And I just want to emphasize there's absolutely nothing, and I mean nothing in the record to connect any of this. What if there were? Would it make a difference? I, well, ultimately it would not because it was not First Amendment retaliation, but for purposes of the city, the key issue for us is whether or not there's Monell liability. It's well established that a city is not liable for every conduct of its employee. There's no respondeat superior in these cases. You have to show that the city is acting. And the way you show the city is acting is by a policy. Here the policy is against. Well, the Monell claim, you know, was not reached below and need not be reached unless, you know, we were to disagree with the determination below. Then we would have to address, I guess, arguably the Monell claim, right? Absolutely, and I believe there was no First Amendment retaliation at all, and that is an issue that was focused upon. Who's going to argue that issue? Because I'm curious as to where one draws a line in trying to separate how far one can go to qualify whether it's a deterrent standard or whether it's a threat and intimidation standard. I'm not so clear what the right standard is that should be applied to the Ninth Circuit under existing law. But there comes a point in time when there must be a line to be drawn someplace. Where is that line? Correct, and I believe that that I am going to defer to my counsel for the lead on that. But I must say that the line was not reached here. Really, when you look at the record, there's very inflammatory accusations made in the briefs, but then when you look at the actual record, it just simply is not there. What you find are a couple of emails. What is cited for this very extreme allegation that the LAPD leaked all this information to the press, you look at the citation, it's actually just the articles, the published articles. There's absolutely nothing to say who the source is or, more importantly, to connect you to the LAPD or the city attorney's office. Well, I just want to be clear. So someone else is going to talk about the standard to be employed here when you're dealing with a retaliation claim that's predicated on an underlined speech, right? Correct. So I'll save my questions for later on. Correct, the lead who focused on that issue in their brief. I would also like to point out that the pre-force and the Hays argument was actually not addressed in the opposition to, the way it would have come up, would have been the opposition to Nichols MSJ, and that was not, the Hays argument was not fleshed out. So do you think they've waived that argument here? I would say yes because it's not an issue that's, they're raising it on the issue of undisputed facts, not as a de novo issue of law. But that was, it was not argued at all, and the district court did not have an opportunity to consider it. On the negligence claim, the key issue for the city is the negligence supervision claim, and I think even the plaintiffs would acknowledge that the jury finding in favor of the officers on the excessive force means the negligence supervision claim really just simply cannot proceed at all against the city. The last two points that were made, the evidentiary errors, seem to follow a theme that I'm seeing in this case, which is this. The theme is that allegations somehow are supposed to rise to the level of actual facts. That's just not what the law allows. And in each of these instances, the fact that Mulligan was not charged criminally with breaking into cars and carjacking does not mean in any way, shape, or form that these officers did not actually observe him doing that. There is a broad myriad of reasons why charges are not filed against individuals. The fact that they were not filed is not evidence that that conduct did not occur. And the fact that Mulligan now wants to use that as evidence in that way, it's just simply inappropriate. And it's very similar, actually, to the secondary evidentiary issue, which is the issue about Nichols and the allegations against him relating to these sexual assaults. Yes, these are alleged heinous crimes, but the fact that they are alleged is not the fact that they happened. And the LAPD was investigating them at the time. The result of that investigation was that they could not resolve it. To use that as evidence that he is the serial rapist, it just doesn't rise to that level. And even if it did, by the way, as Mr. Zeman pointed out, it's completely discreet behavior. So it's really textbook character evidence. You can't bring in this prior act evidence to say, oh, he was doing these things with these females, so that means on this night he also beat up Mr. Mulligan. We have a jury verdict. The jury has heard all this. The jury has spoken. The jury has rejected all of this. And now on appeal, we need to respect that jury's finding. And Mr. Mulligan is trying to undo that finding that he doesn't like really based upon innuendo and speculation and assumptions. And those assumptions are always premised upon allegations, not facts, but allegations. And that, I think, should not be condoned on appeal. Unless there's more questions for me, I will defer to Mr. Cote. Okay. Thank you. Good morning, Your Honors, and may it please the Court. My name is Alexander Cote, and I represent the Police Protective League. It's President Tyler Eisen and its media consultant, Eric Rose. And I want to go directly to Judge Block's question about what the standard should be here. The Supreme Court has been crystal clear that when it comes to truthful speech on a matter of public concern, the First Amendment cannot countenance censorship. I refer to the Bart Icke case on that point, and I refer to the Snyder case on that point. But the Supreme Court never said that under no circumstances can you have retaliation of a constitutional nature. They never really went that far. The Supreme Court has never said that in the context of a retaliation claim. That's true. But in the Bart Icke case, it was in the context of another federal statute, the Wiretap Act, and the Court found that the Constitution, the First Amendment, prevented the application of the Wiretap Act to truthful speech on a matter of public concern. I think that's basically correct as a general proposition, but there must come a point in time when you can't countenance, you know, abusive behavior on the part of authorities. It can't be an open field. There's got to be a line to be drawn someplace. I agree there's a line to be drawn, but where I'm drawing the line is where the Supreme Court has drawn the line, which is on truthful speech on a matter of public concern. If the speech was not truthful, that would be a different aspect. Well, there are allegations here that they did so many things. I think your adversary pointed out that there were press releases and that there was a concerted effort here to really, you know, stigmatize them in the most significant way and that that would satisfy some sort of intentional behavior, misconduct that should really cross the line between what's permissible, given the fact that there was an underlying speech that we're dealing with. I understand that, but you're saying that after that there's no holds barred, you can say or do anything you want because of the fact that the foundation was predicated upon speech? There's two speakers, and there's two aspects of speech in this case, and I want to make sure that we don't confuse them. There's Mr. Mulligan's accusation that the police officers lied in their arrest report. And that speech, I'm satisfied, can give birth to, you know, so-called, for lack of a better phrase, retaliatory, constitutionally permissible retaliatory speech. That I can accept, but you know what, how about beyond that? Well, the retaliation or the retaliatory speech in this case was merely the police union releasing the recording that contradicts that. The underlying statements that he made, I guess, right? But there's some allegations here that they did much more than that. There's actually no allegation that the police union did anything more than release the publication. There's a suggestion that they went to great lengths to try to obtain the tape from the police department, but all those efforts were fruitless. We know how the police union got the tape. They got the tape from the city attorney. And with respect to the joint action question, which has been raised, the evidence is clear that the parties were at cross purposes when it came to the publication of that tape, when the city attorney provided the tape, the evidence is clear. The city attorney said to Mr. Eisen, the president of the police union, don't publish this tape. In fact, don't even let anyone know we have it. Check me if I'm wrong. Were there accusations here that he was a criminal, that he was a terrible person, that all sorts of horrible defamatory things were said about him separate apart from the tape? There's no defamation claim in this suit. I understand. So if there had been such a claim, it would have opened a whole host of other issues, such as were those opinions or hyperbolic rhetoric, would there be a proper injury from the defamation? In the Ninth Circuit, as in the Supreme Court, there's heightened standards required for defamation in the context of public issues. These are all issues that were never pled by Mr. Mulligan, I think, advisedly, because the standard would be so much higher. The gist of the complaint is the publication of the recording. So the Sixth Circuit in this Block case says that this publication of private facts can constitute retaliation for First Amendment retaliatory action. That's right. So how do you distinguish Block, or do you think it's wrongly decided? I said in the beginning that what we're dealing with here is truthful speech on a matter of public concern. Well, this was details about her rape, and presumably truthful. There is no indication that it wasn't correct. The issue here is public concern. In Block, the plaintiff was a rape victim, and she accused the sheriff of not diligently prosecuting the claim. And the Sixth Circuit started its analysis by saying the sheriff has a right to respond to those criticisms. What he doesn't have the right to do is disclose irrelevant, humiliating, and confidential information. In other words, he didn't have the right to disclose information that was not a matter of public concern. Or that was not responsive to the charges, that he wasn't investigating the crime. I'm having trouble with that line because he was describing the details of a crime that was being investigated and was clearly a matter of public concern. Here, I guess the tape was regarding his discussion about use of bath salts. It's hard to see why that wasn't any more of a matter of public concern. That wasn't even the same sort of crime as the rape in the Block case. In the Block case, the Sixth Circuit was very clear to note that the speech there by the sheriff was not responsive to the allegation that he wasn't diligently prosecuting the rape. In this case, the recording that was released by the police union directly refutes Mr. Mulligan's accusation that the officers lied in the arrest report. So you're saying it has to be responsive, that that's another requirement in order not to be actionable. Is that your position? It certainly is helpful. I don't think it's necessarily required in all circumstances, but that is the way to distinguish Block. I think if Block were to be interpreted as standing for the proposition that speech on a matter of public concern can be shut down by someone who doesn't care for it or found it unpleasant or uncomfortable, that would be a problem under the Supreme Court authority. I think the way we distinguish Block is to note that it was not a matter of public concern. The details that were disclosed by the sheriff as alleged by the plaintiffs in that case were so gruesome and so shocking that she hadn't even told her own husband about them. This is not that kind of a case at all. This is Mr. Mulligan having a speech, excuse me, having a conversation with a Glendale police officer in uniform on broad daylight in front of the police station. It doesn't even come close to rising to the same level. That's why Block is different. It's simply not a matter of public concern. The thread that I find throughout Mr. Mulligan's briefing is that my clients don't have a First Amendment right in this case because their speech caused him incredible pain or, as he put it in the brief, devastating harm. This is the exact argument that was rejected by the Supreme Court in Snyder. The Supreme Court noted in that case that the Westboro Baptist Church's words in that case caused incredible harm and pain to Corporal Snyder's parents, but the Chief Justice, writing for the majority, concluded his opinion by noting that we cannot react to that pain by punishing the speaker. As a nation, we have chosen a different course to protect even hurtful speech to ensure that we do not stifle public debate. As Judge Clifton noted, this entire suit is an attempt to stifle public debate. It's to prevent anyone from responding to Mr. Mulligan's allegations that the officers lied in the police report, and the First Amendment cannot countenance that. I see that I'm out of time. Are there any further questions? Apparently not. Thank you. Thank you. I thank all counsel for your helpful arguments. I don't think you have any time left for rebuttal. Is that the case? So the case just argued is submitted.
judges: Clifton, Ikuta, Block